UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Mahlon Martin,

            Plaintiff,

    vs.

First Advantage Background Services
Corp., and Wells Fargo Bank, NA,

            Defendants.

Court File No. 11-CV-03357 (MJD/LIB)

**PLAINTIFF'S MEMORANDUM
OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO
DISMISS**

      Plaintiff Mahlon Martin, by and through his undersigned counsel, submits the

following Memorandum of Law in Opposition to Defendant First Advantage Background

Services Corp.'s Motion to Dismiss and Defendant Wells Fargo Bank, NA's Motion to

Dismiss.[1]

## INTRODUCTION

      Plaintiff Mahlon Martin ("Martin") opposes Defendant First Advantage

Background Services Corp.'s ("FABSC") Motion to Dismiss Counts I, II, III and IV of

his Complaint and Defendant Wells Fargo Bank, NA's ("WF") Motion to Dismiss Count

V of his Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).   According to

the general rules of pleading, to state a claim a complainant need only make a short and

plain statement of the claim showing that the pleader is entitled to relief.   A complaint

---

[1] While Defendants' Motions were filed separately, due to the similarities of the factual
and legal arguments presented herein, Plaintiff jointly submits his opposition to
Defendants' Motions.

does not need to allege specific or detailed facts, but simply allege facts that "raise a right to relief above the speculative level."

In this case, Martin was a dedicated and loyal employee of Defendant WF.  During his employment he passed several criminal background checks seemingly without issue or problem.  When he applied and received a new position with WF, he underwent a third criminal background check, prepared by Defendant FABSC.  Almost immediately after WF's receipt of FABSC's report, Martin was abruptly terminated, being told that he was fired for a criminal matter in 1997.  That same day, Martin promptly went to the courthouse and faxed the criminal report records to WF, showing that he was neither precluded from employment with WF, or his new position.  But it was to no avail.

Only days later, did he receive a "pre-adverse action notice," indicating that an employment action *may* be taken because of the results of the criminal background check. Martin further learned that the report prepared by FABSC indicated that he had been convicted of a crime and served one year in jail.  In fact, Martin had only been charged with a misdemeanor, which had been dismissed.  Despite a federal statute designed to ensure that background checks be accurate and, critically, that employees be granted an opportunity to correct erroneous information, Martin was summarily terminated— because data out in the ether, and not subject to his control, erroneously indicated he had been incarcerated for a year.

Plaintiff's Complaint sufficiently pleads claims under the Fair Credit Reporting Act.  It not only provides Defendant notice of these claims and the basis for the claims, but it also raises a right to relief.  Defendants' motions for dismissal, however, rely

merely upon conclusory speculation, illustrate significant disputes of fact and the need

for discovery to adjudicate Martin's claims on their merits.  Both of Defendants'

Motions, therefore, should be denied in their entirety.

In the alternative, should the Court grant either or both of Defendants' Motions,

Plaintiff respectfully requests that dismissal be without prejudice and he be granted leave

of Court to amend his Complaint.

## PROCEDURAL AND FACTUAL BACKGROUND

Martin commenced this action in the County of Hennepin, State of Minnesota, via

service of the Summons and Complaint on October 20, 2011.  (See Summons and

Complaint, Dkt. 1, Ex. 1.)  Defendants removed this action to United States District

Court, District of Minnesota on or around November 15, 2011.  (Docket No. 1.)

Martin initially began his employment with Defendant Wells Fargo Bank, NA

("WF") as a contract employee in or around May, 2009, staffed through Masterson

Personnel ("Masterson") a third-party staffing agency.  (Complaint ¶ 6, Dkt. 1, Ex. 1.)

As part of his contract employment with WF, Martin submitted to a criminal background

check ("May 2009 consumer report").  (Id. ¶ 7.)  Upon Martin's best information and

belief, ADP Screening and Selection services prepared the May 2009 consumer report,

which included a criminal background check, which was prepared for, and submitted to,

Masterson and WF.  (Id. ¶ 8.)  Upon Martin's best information and belief, Martin's May

2009 consumer report was unremarkable.  (Id. ¶ 9.)  In any event, Martin was not notified

by Masterson or WF of any negative information in the May 2009 consumer report, nor

did anyone indicate that he was precluded from employment with WF through Masterson.  (Id. ¶ 10.)

Martin worked as a contract employee at WF, through Masterson, until he was laid off in or around July 2009.  (Id. ¶ 11.)  In or around August 2009, Martin became employed by WF in WF's default/collections department.  (Id. ¶ 12.)  At the time of Martin's hire in August 2009, Plaintiff consented to a background check ("August 2009 consumer report").  (Id. ¶ 13.)  Upon Martin's best information and belief, Martin's August 2009 consumer report was unremarkable—Martin was not notified of any problems or negative information contained in the August 2009 consumer report, nor did anyone indicate that he was precluded from employment with WF.  (Id. ¶¶ 14, 15.)  From August 2009 to October 2010, Martin performed his position to the satisfaction of his employer, WF.  (Id. ¶ 16.)

In or around October 2010, Martin accepted a position as a TeleSales Specialist in WF's home mortgage department.  (Id. ¶ 17.)  In or around January 2011, Martin consented to another background check ("February 1, 2011 consumer report").  (Id. at ¶ 18.)  The February 1, 2011 consumer report was prepared by Defendant First Advantage Background Services Corporation ("FABSC").  (Id. ¶ 19.)  On or around February 1, 2011, WF obtained the February 1, 2011 consumer report from FABSC.  (Id. ¶ 23.)

On or around February 4, 2011, Martin was asked to meet with his supervisor at WF, Kai Larson ("Larson").  (Id. ¶ 24.)  Larson informed Martin that his employment with WF was terminated due to the results of the February 1, 2011 consumer report.  (Id. ¶ 25.)  Larson further handed Martin a letter that read, "Letter 1 — Team members

ineligible for continued employment due to background check results." (Id. ¶ 26.) According to this letter, "a record was found making [Plaintiff] ineligible for employment with Wells Fargo." (Id. ¶ 26.)

On or around February 4, 2011, Martin telephoned WF's human resources department to learn additional information about the circumstances of his termination. (Id. ¶ 28.) Martin was informed by Tami Burnham ("Burnham") that his employment was being terminated because of a criminal matter in 1997, and that he would receive a copy of the February 1, 2011, consumer report. (Id. ¶ 29.)

Martin went to the Ramsey County courthouse and retrieved a copy of the documents relating to his criminal charge in 1997. (Id. ¶ 30.) The documents relating to Martin's criminal matter in 1997 indicated that Martin was charged with a misdemeanor, and that the case had been dismissed without any finding of guilt or conviction. (Id. ¶ 31; Declaration of Mahlon Martin Ex. (a).)[2] Martin promptly faxed a copy of the court records to Burnham on February 4, 2011, and indicated that he was not disqualified from employment with WF. (Complaint ¶ 32.) Indeed, Martin is not disqualified as serving as a mortgage loan originator according to state and federal laws and regulations, is not prohibited from employment with WF according to state and federal laws and regulations, and is not disqualified from employment based on WF's own policies. (Id. ¶¶ 33, 35.)

---

[2] The only exhibit attached to the Declaration of Mahlon Martin is Exhibit (a). Hereafter, all citations to this exhibit are cited as: "Martin Decl. Ex. (a)."

On or around February 7, 2011, after his termination, Martin received a copy of the February 1, 2011 consumer report prepared by FABSC.  (Id. ¶ 36.)  The documents that Martin received on February 7, 2011, from FABSC included a document titled, "Pre-Adverse Action Notification."  (Id. ¶ 37.)  The "Pre-Adverse Action Notification" indicated that the contents of Martin's February 1, 2011 consumer report were "under review in consideration of your employment and an adverse employment action may be based, in whole or in part, on this report."  (Id. ¶ 38.)

The February 1, 2011 consumer report prepared by FABSC erroneously reports that Martin was convicted of a crime and sentenced to one year in jail.  (Id. ¶ 42.)  On or around April 22, 2011, Martin wrote FABSC challenging the accuracy of the February 1, 2011 consumer report.  (Id. ¶ 44.)  Thereafter, Martin was notified by FABSC that it believed the consumer report was accurate and that no corrections would be made.  (Id. ¶ 45; Exhibit 4 to the Declaration of Jason A. Spak.)[3]

## ARGUMENT

### I.  Standard of Review

Defendant FABSC and Defendant WF both move this Court to dismiss Plaintiff's Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The purpose of a motion to dismiss is "to test the formal sufficiency of the statement of the claim for relief."  5B Charles Alan Wright and Arthur R. Miller,

---

[3] The Declaration of Jason A. Spak was submitted regarding Defendant FABSC's Motion to Dismiss, Dkt. No. 13.  Hereafter, all exhibits attached to the Declaration of Jason A. Spak regarding Exhibits to Motion to Dismiss are cited to as: "Spak Decl. Ex. ___ ."  All exhibits to the Spak declaration are identified by numbers.

Federal Practice and Procedure § 1356 (3d ed. 2004).  It is "not a procedure for resolving a conflict between the parties about the facts or the substantive merits of the plaintiff's case."  Id.  To comply with the rules and sufficiently state a claim, a pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief".  Fed. R. Civ. P. 8(a)(2).  On a motion to dismiss, the Court must assume all facts in the complaint to be true and construe them in a light most favorable to the plaintiff.  Doe v. Cassel, 403 F.3d 986, 987 (8th Cir. 2005)(citing Midwestern Mach., Inc. v. Northwest Airlines, Inc., 167 F.3d 439, 441 (8th Cir. 1999)).

Plaintiff's Complaint is sufficiently supported with facts that state a claim for relief.  It gives Defendant fair notice of what his claims are, and the grounds upon which those claims rest.  Defendants' Motions for dismissal, however, are conclusory and speculative.  Defendants' arguments are premised on assumptions of facts neither implicated by Plaintiff's Complaint, nor supported by admissible evidence properly considered on a Rule 12(b)(6) motion.  As set forth in the Defendants' Memoranda, the Defendants dispute facts amongst each other, and discovery is wholly necessary to adjudicate Plaintiff's claims on the merits.  Most critically, however, Defendants have failed to establish that dismissal is proper.

## II.     Matters Not Currently in Dispute

While the Defendants' arguments vary slightly, Defendants chiefly argue that the February 1, 2011 Consumer Report was not a "consumer report" within the meaning of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681a et seq.  Defendants argue

this requires dismissal of Plaintiff's Counts I, II, III and V (FABSC Memorandum of Law in Support of Motion to Dismiss at 10–11; WF Memorandum of Law in Support of Motion to Dismiss at 5–10.)[4]   Defendant FABSC further argues that Plaintiff's Count IV, Failure to Reinvestigate, should also be dismissed for reasons unrelated to whether the February 1, 2011 consumer report was a "consumer report" within the meaning of the FCRA.   Defendants, however, do not challenge the following under the FCRA at this time: whether FABSC is a Consumer Reporting Agency ("CRA"), the accuracy of the February 1, 2011 consumer report,[5] whether Martin's termination was an adverse action by WF, and whether the reason for the adverse action by WF was based in whole or in part by the report.

### III.   Defendants Have Failed to Show that Martin's Background Check was Not a "Consumer Report" Within the Meaning of the Fair Credit Reporting Act

The FCRA provides that "consumer report[s]" do not include communications "made to an employer in connection with an investigation of--(i) suspected misconduct relating to employment; or (ii) compliance with Federal, State, or local laws and regulations, the rules of a self-regulatory organization, or any preexisting written policies of the employer."   15 U.S.C. 1681a(d)(2)(D) and (y).   This exclusion further only applies if:

---

[4] Hereafter, all citations to FABSC Memorandum of Law in Support of Motion to Dismiss are cited to as: "FABSC Mem. at ___ ."   All citations to WF Memorandum of Law in Support of Motion to Dismiss are cited to as "WF Mem. at ___ ."
[5] Except to the extent that Defendant FABSC challenges the accuracy of the information it alleges was disputed by Martin, and reinvestigated by FABSC.   See infra Argument § IV.

(C) the communication is not made for the purpose of investigating a consumer's credit worthiness, credit standing, or credit capacity; and (D) the communication is not provided to any person except--(i) to the employer or an agent of the employer; (ii) to any Federal or State officer, agency, or department of a unit of general local government; (iii) to any self-regulatory organization with regulatory authority over the activities of the employer or employee; (iv) as otherwise required by law; or (v) pursuant to section 1681f of this title.

15 U.S.C. § 1681a(y).  (See also FABSC's Mem. at 3–6; WF Mem. at 5–10.)  For brevity, this exemption will hereafter be referred to by Plaintiff as "the employment investigation exemption."  This exemption excludes qualifying reports from the protection and requirements of "consumer reports" mandated by the FCRA.

For the employment investigation exemption to apply, it must be made *in connection* with *an investigation of* suspected misconduct relating to employment *or compliance* with Federal, State, or local law and regulations, the rules of a self-regulatory organization, or any preexisting written policies of the employer.  See 15 U.S.C. § 1681a(y).  Neither Defendant has argued, nor is it evident from the Plaintiff's Complaint, that the February 1, 2011 Consumer Report was for the purpose of an investigation into "suspected misconduct."  There is no reference to "misconduct" at all.  Instead, the inquiry is whether the February 1, 2011 Consumer Report was *in connection with an investigation* into whether *WF* was *complying* with laws and rules.  See 15 U.S.C. § 1681a(y).

Tellingly, Defendants have taken radically different positions regarding the purpose of the February 1, 2011 Consumer Report.  FABSC takes the position that the purpose of the February 1, 2011 background report was for the purpose of determining

9

WF's compliance with the Financial Institutions Reform, Recover, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (codified in scattered sections of 12, 18, and 31 U.S.C.)  (FABSC Mem. at 4–8.)  In contrast, however, WF—who would seemingly be in a better position to describe the purposes and reasons it requested the February 1, 2011 consumer report—argues that the February 1, 2011 consumer report was for the purpose of determining WF's compliance with the Mortgage Licensing Act of 2008 ("SAFE Act"), 12 U.S.C. § 5101 et seq.  (WF Mem. at 7 ("In this case, Wells Fargo initiated the Background Check to comply with the SAFE Act.").)  This conflict cannot be adjudicated from the documents of record, but the reasonable inferences drawn from Martin's Complaint supports the position argued by WF: Martin was subjected to another background check after accepting a new position in WF's home mortgage department.

In any event, and despite the Defendants' conflicting positions, neither argument is supported by admissible evidence at this time, nor implicated by Plaintiff's Complaint.  Indeed, as set forth more fully below, both Defendants nebulously assert compliance with the law as the reason for the February 1, 2011 report, even though Defendants disagree as to *actual purpose* of the report.  Defendants just assert, "It must be true."  The *purpose* of the report, however—that it be in connection with an investigation into WF's compliance with the law—is determinative.  As such, Plaintiff is entitled to discovery to determine the purpose of the February 1, 2011 consumer report at issue.  Discovery likely to lead to information relevant to this determination are WF's implementation of its compliance efforts with the SAFE Act, written policies and procedures WF is required to maintain pursuant to 12 C.F.R. § 34.104, discovery regarding the contractual arrangements

between Defendants WF and FABSC, and discovery of other employees who have been subjected to background checks by WF, whether by FABSC or other third-parties.

Most critically, however, WF's position that it procured the February 1, 2011 consumer report for the alleged "purpose" of "complying" with the SAFE Act, (WF Mem. at 7), reveals that the February 1, 2011 report *is not subject to the employment investigation exemption*. Dismissal on the pleadings is therefore precluded.

### A.   Defendant WF's Argument that the Report was for the Purpose of Investigating Compliance with the SAFE Act Precludes Dismissal

Defendants' Motions to Dismiss cannot establish two key elements for the statutory employment investigation exemption to apply. First, Defendants cannot establish as a matter of law, on a motion to dismiss, that the February 1, 2011 consumer report was for the purposes of an investigation. Second, Defendants cannot establish as a matter of law that the February 1, 2011 report was relating to Defendant WF's compliance with the SAFE Act.

The SAFE Act does not alter state licensing requirements for mortgage loan originators. Under Minnesota state law, mortgage loan originators, such as Martin, need not be licensed by the State as they are employees of a bank regulated by the Federal Deposit Insurance Act, FDIA. Minn. Stat. § 58A.03, Subd. 2; Minn. Stat. § 58.04, Subd. 1(c)(2); Minn. Stat. § 58.02, Subd. 10; see also FABSC Mem. at 4–5 (indicating WF is an insured depository institution subject to FDIC regulation under the FDIA). Instead, the basic mandate of the SAFE Act is that mortgage loan originators obtain and maintain an

annual registration in a nationwide registry, the Nationwide Mortgage Licensing System

and Registry ("NMLS").  See, generally, 12 C.F.R. § 34.101.

Contrary to the implications of Defendant WF, criminal background searches are

*not* required for the purposes of complying with the SAFE Act.  The requirements for

compliance with the SAFE Act are limited and narrow—the basic purpose of the Act is

register and track mortgage loan originators via  unique identifiers.  *Employees* who are

employed as mortgage loan originators are required to ensure that they are registered with

the NMLS, obtain a unique identifier, and ensure that the information required by

regulation at 12 C.F.R. § 34.103(d),is timely submitted.  See, e.g., 12 C.F.R. §

34.101(c)(2)(ii)("Prior to engaging in mortgage loan origination activity that exceeds the

[de minimis] exception limit . . . a national bank employee must register with the Registry

pursuant to this subpart."); 12 C.F.R. § 34.103(a)("Each employee of a national bank who

acts as a mortgagee loan originator must register with the Registry, obtain a unique

identifier, and maintain this registration in accordance with the requirements of this

subpart.  Any such employee who is not in compliance with the registration and unique

identifier requirements set forth in this subpart is in violation of the S.A.F.E Act and this

subpart.").  Further, *it is the employee* who is required to "[a]ttest to the correctness of all

information" regarding the employee set forth in 12 C.F.R. § 34.103(d).  12 C.F.R. §

34.103(d)(ii).  In contrast, *employers* are only required to ensure employees register with

the Registry, prohibit employees from acting as mortgage loan originators unless the

employee is registered, submit contact information and other limited information

regarding the institution, confirm that it employs the registrant, notify the registry when

the employees ceases to be an employee, and adopt and follow certain written policies.

See 12 C.F.R. §§§ 34.103(a)(2), 34.103(e), 34.104.

Regarding an employee's submissions to the Registry, the employer's obligations are extremely narrow.  To comply with the SAFE Act, an employer's obligation is to "[e]stablish reasonable procedures for confirming the adequacy and accuracy of employee registrations, including updates and renewals, *by comparisons with its own records*." 12 C.F.R. § 34.104(d)(emphasis added).  Defendant WF complies with the SAFE Act by comparing an employee-Registrant's submission to NMLS with the personnel file maintained by WF.  Addressing the regulations promulgated to implement the SAFE Act, the agencies adopting those rules explicitly stated: [6]

> . . . the Agencies clarify that they will consider an institution to have reasonable procedures if it confirms the information supplied to the Registry that is in the institution's personnel files.   Typically this information would include the employee's name; home address; business address and contact information; social security number; gender; date and place of birth; and financial services-related civil actions, arbitrations and regulatory actions taken against the institution's employee, if any . . . . [I]nstitutions need only compare the information *supplied by the employee* with the information contained *in the institution's own records*.  The final rule *does not require, nor do the agencies expect*, Agency-regulated institutions *to obtain private database searches on their employees* to confirm employee registration information.

75 Fed. Reg. 44673 (July 28, 2010)(emphasis added).

---

[6] Those agencies are: Office of the Comptroller of the Currency, Department of Treasury; Federal Reserve System; Federal Deposition Insurance Corporation; Office of Thrift Supervision, Department of the Treasury; Farm Credit Administration, and; National Credit Union Administration.  See 75 Fed. Reg. 44,656 (July 28, 2010).

By the clear terms of the laws and regulations, criminal background checks are not required by, and are irrelevant to, an employer's compliance with the SAFE Act.  Instead, under the explicit terms of the SAFE Act, the NMLS requires the following submissions:

> (A) fingerprints for submission to the *Federal Bureau of Investigation*, and *any governmental agency or entity* authorized to receive such information for a State and national criminal history background check; and
> (B) personal history and experience, *including authorization for the Nationwide Mortgage Licensing System and Registry to obtain* information related to any administrative, civil or criminal findings by any governmental jurisdiction.

12 U.S.C. § 5106(a)(2)(emphasis added).  While the SAFE Act authorizes governmental agencies or entities to conduct background searches, including registrants' criminal history, it does not provide the same authorization to employers of mortgage loan originators.

Again, it bears repeating that for the employment investigation exemption to apply, the February 1, 2011 report must have been *in connection with* an *investigation* into *WF's compliance* with laws or regulations.  Criminal background checks by WF for employees registering for the NMLS *are not* required for *compliance* with the law.  Nor can Defendants establish that the February 1, 2011 consumer report was in connection with *an investigation*.  Specifically, employers are not required to attest to the veracity of the information submitted by the Registrant beyond comparing the information in the Registration to that contained in the employee's personnel file.

An "investigation" by Defendant WF into its compliance with the SAFE Act may include processes to identify employees that are required to register with the NMLS and that those employees are notified of the registration requirements.  See 12 C.F.R. §

34.103(a)(2).  Criminal background checks, however, are unrelated to WF's compliance

with the SAFE Act.  As such, Defendants cannot establish two key elements for the

statutory employment investigation exception to apply.  Dismissal is therefore improper.

### B.  The Employment Investigation Exemption Does Not Provide WF Unfettered Access to Consumer Reports Regardless of Purpose

Both Defendants have taken the position that because WF is a banking institution

it is essentially given unfettered discretion to procure consumer reports on its employees,

and that neither it, nor the consumer reporting agencies ("CRAs") producing those

reports are subject to the basic requirements of the FCRA—that the CRAs follow

reasonable procedures to ensure the maximum possible accuracy of its reports, and that

employers provide some notice allowing an employee to correct erroneous information.[7]

See 15 U.S.C. §§ 1681e(b), 1681b(b).

Defendant WF particularly emphasizes its belief that it can engage in sweeping

background checks regardless of whether the purpose of the same is to investigate its own

compliance with the law.  (See WF Mem. at 7–8.)  WF can only nebulously allege that

the February 1, 2011, consumer report was mandated by some law or some policy.  To

wit, WF asserts that the February 1, 2011 consumer report was for the purposes of

---

[7] The purpose of the pre-adverse action notifications contained in 15 U.S.C. § 1681b(b)(3) are exactly the concerns at issue here.  As noted by the Federal Trade Commission, when the information contained in a report would automatically disqualify an applicant or employee is "precisely the situation where it is important that the consumer be informed of the negative information in case the report is inaccurate or incomplete.  If the report is in error, the employer may reconsider his or her tentative decision to take adverse action."  FTC Opinion Letter, June 9, 1998 (attached as Exhibit A to the Declaration of Daniel Gray Leland, available at http://www.ftc.gov/os/statutes/fcra/rosen.shtm (last visited January 10, 2012)).

determining compliance with the SAFE Act, then, for reasons unclear, addresses Section 19 of FIRREA.  (See Mem. at 8.)  WF further argues that a sweeping background check was required pursuant to its written policies, yet fails to identify the policy whereby employees who are required to register with the NMLS are subjected to a sweeping background check.

Defendants' position is unsupported by the language of the statute.  Instead of adhering to the statutory language, Defendants request this Court find that as long as a background report *may* implicate *some* law at *some time* it falls within the employment investigation exemption.  This argument is a red herring and ignores the plain language of the exemption: the report must be *in connection with an investigation*.  There must be a *connection* between the information requested and reported and the employer's compliance with the law.  A contrary interpretation would render the employment investigation exemption meaningless.

Such an interpretation is also contrary to the purpose of the FCRA:

Congress enacted the Fair Credit Reporting Act, 12 U.S.C. § 1681, in 1970 out of concerns about abuses in the consumer reporting industry. (See S. Rep. No. 91-517, at 3 (1969); 116 Cong. Rec. 35941 (1970)(statement of Sen. Proximire); id. at 36570 (statement of Rep. Sullivan); Guimond v. Trans Union Credit Info. Co., 45 F.3d 1329, 1333 (9th Cir. 1995); St. Paul Guardian Ins. Co. v. Johnson, 884 F.2d 881, 883 (5th Cir. 1989); Hovater v. Equifax, Inc., 823 F.2d 413, 416–17 (11th Cir. 1987).  "Employers were placing increasing reliance on consumer reporting agencies to obtain information on the backgrounds of prospective employees.  Congress found that in too many instances agencies were reporting inaccurate information that was adversely affecting the ability of individuals to obtain employment.  As Representative Sullivan remarked, "with the trend toward . . . the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal 'blips' and key punch holes in a stolid and unthinking machine which can

> literally ruin his reputation without cause, and make him unemployable."
> 116 Cong. Rec. 36570 (1970).

Dalton v. Capital Associated Industs., Inc., 257 F.3d 409, 414–15 (4th Cir. 2001).

Because of this very concern that consumer reports can "ruin reputation without cause" and make an individual "unemployable," the FCRA has *heightened* standards— above and beyond the FCRA standards for other types of information—for matters of public record that are likely to have an adverse effect upon a consumer's ability to obtain employment.  See 15 U.S.C. 1681k; Dalton, 257 F.3d at 417 (citation omitted).

Moreover, the FCRA is a remedial statute, and courts construe it liberally to give effect to the intent of Congress.  Johnson v. ADP Screening and Selection Svs., Inc., 768 F. Supp. 2d 979, 983 (D. Minn. 2011); see also Cortez v. Trans Union, LLC, 617 F.3d 688, 710 and 715 n.33 (3d Cir. 2010)(noting the remedial focus of the FCRA, and stating, "Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme . . . .)  To the extent that the parties' disagreement over the meaning of the statutory language is illustrative of statutory ambiguity, legislative history is of use in determining the remedial intent of Congress.

The employment investigation exemption was implemented by Title VI of the Fair and Accurate Credit Transaction Act ("FACTA").  See Fair and Accurate Credit Transactions Act, Public Law 108–159, 117 Stat. 1952.  FACTA Title VI is titled, "Protecting Employee Misconduct Investigations."  Id.  The origin of FACTA Title VI, Protecting Employee Misconduct Investigations, can be traced to an opinion letter interpreting the FCRA issued by the Federal Trade Commission ("FTC") on April 5,

2009.  This opinion letter, often referred to as the *Vail* opinion letter due to the name of

the addressee, addressed sexual harassment investigations in the context of the Fair

Credit Reporting Act.[8]  In the *Vail* opinion letter, the FTC took the position that if any

employer utilized an outside third-party for conducting an investigation into sexual

harassment allegations (and the third-party otherwise qualified as a CRA), the resulting

report was subject to the requirements of the FCRA.

As the legislative history of FACTA Title VI indicates, it was solely drafted to

exempt employment misconduct investigations—i.e. investigations into claims of

discrimination and harassment, etc.—from certain provisions of the FCRA.  The "Civil

Rights and Employee Investigation Clarification Act" ("CREICA"), which later became

FACTA Title VI, see H.R. Rep. 108-263, at 27 (2003) specifically stated:

(1)  The Fair Credit Reporting Act, as interpreted by the Federal Trade
     Commission, impedes investigations of workplace misconduct.

(2)  The Fair Credit Reporting Act undermines the ability of employers to use
     experienced outside organizations or individuals to investigate allegations
     of drug use or sales, violence, sexual harassment, other types of
     harassment, employment discrimination, job safety and health violations,
     as well as criminal activity, including theft, fraud, embezzlement, sabotage
     or arson, patient or elder abuse, child abuse, and other types of misconduct
     related to employment.

(3)  Employers have been advised by agencies and the courts to utilize such
     experienced outside organizations and individuals in many cases to assure
     compliance with civil rights laws and other laws, as well as written
     workplace policies.

---

[8] The *Vail* opinion letter is attached as Exhibit B to the Declaration of Daniel Gray
Leland.  The *Vail* opinion letter can also be found on the Federal Trade Commission's
website, at: http://www.ftc.gov/os/statutes/fcra/vail.shtm (last visited January 10, 2012).

(4)  Employers and consumers are put at risk because the Fair Credit Reporting Act frustrates or impedes employers in their efforts to maintain a safe and productive workforce.

(5)  The Fair Credit Reporting Act should not chill the use of experienced outside organizations or individuals to assist employers in their investigations of workplace misconduct or misbehavior by potentially subjecting those employer to additional liabilities or damages.

H.R. 1543 § 1(b), 108th Cong (2003).

Representative Sessions, who sponsored CREICA, stated that Title VI would "reverse" the *Vail* opinion letter.  149 Cong. Rec. H12220 (daily ed. November 21, 2003)(statement of Rep. Sessions).  The concern, as articulated by Representative Sessions, was that the *Vail* opinion letter "meant that in a workplace misconduct circumstance, a person who violated another person or who broke the law would actually have to be given information about any investigation that might take place against that individual under privacy rules and regulations passed by and supported by the Federal Trade Commission."  Id.

Indeed, Rep. Sessions had earlier stated:

This legislation also contains a provision of special interest to me and a number of my colleagues from both sides of the aisle.  Title VI of this legislation contains a provision that I have authored that I believe will improve workplace safety for millions of Americans.  Right now, an opinion by the Federal Trade Commission uses an interpretation of FCRA to create a disincentive for employers to retain objective and professional investigators of workplace misconduct, such as sexual or racial harassment, workplace violation, threat, fraud, SEC violations or other improprieties.  This legislation would clarify that decision, ensuring that your workplaces are free of violence, fraud and intimidation by all employees.

149 Cong. Rec. H8112 (daily ed. September 1, 2003)(statement of Rep. Sessions).

The purpose of the employment investigation exception is plainly set forth by the title of that provision: "Protecting Employee Misconduct Investigations."  The purpose of the exemption is not, as argued by FABSC, to use "a series of statutory steps" to reconcile conflicts between laws like FIRREA and the FCRA.

As set forth by its legislative history, the employment investigation exemption is narrow, and the FCRA's remedial purpose demands that it be construed narrowly for the protection of consumers.  The FCRA's protections for consumer reports are not exceedingly broad or burdensome—they simply require that reports by CRAs be reasonably accurate and that consumers are afforded the opportunity to dispute erroneous information prior to adverse action.  Put simply, Martin's employment with WF was terminated due to essential breakdowns in these basic protections: the information was inaccurate and he was never afforded the basic opportunity to respond.

An employer must be able to establish that the purpose of the background report is for the purpose of investigating the employer's compliance with the law for the employment investigation exemption to apply.  This WF and FABSC cannot do on a motion to dismiss.  Therefore, Defendants' Motions must be denied.

## IV.   Defendant FABSC's Motion to Dismiss Count IV, Failure to Reinvestigate, Must be Denied

Plaintiff's Count IV alleges that Martin disputed the inaccurate information on the February 1, 2011 consumer report and that FABSC failed to correct or modify the erroneous information.  If a consumer disputes the "completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency" a CRA is

require to, free of charge, "conduct a reasonable reinvestigation to determine whether the

dispute information is inaccurate . . . ." and either record the current status of the

information in dispute or delete it.  15 U.S.C. § 1681i(a)(1)(A); <u>Cortez v. Trans Union,

LLC</u>, 617 F.3d 688, 712 (3rd Cir. 2010).  In order to set forth a claim for relief under this

provision, Martin's pleadings must indicate that FABSC had a duty to reinvestigate and

that it would have discovered a discrepancy had it undertaken a reasonable investigation.

<u>See</u> <u>Dalton</u>, 617 F.3d at 713.  FABSC cannot reasonably challenge, particularly on a

motion to dismiss, that it did not have a duty to reinvestigate.  It is undisputed that Martin

submitted a "Notice of Consumer Dispute" to FABSC.  (<u>See</u> Complaint ¶  44; Spak Decl.

Ex. 3.)

Instead, FABSC chiefly attempts to infinitely parse what constitutes an "item of

information" for the purposes of its duty to reinvestigate.  In this case, it is undisputed

that Martin checked that he was disputing his "Criminal Record," and, specifically, Case

Number "62-TX-97-041983" the arrest record from 1997.  (<u>See</u> Spak Decl. Ex. 3.)  It is

clear that "the item of information" Martin disputed was the 1997 arrest.  Regarding this

criminal charge, the February 1, 2011 consumer report reflects:

Disposition:  10/9/1998      GUILTY
Sentence:      GUILTY 09/15/1997
                    JAIL: 1 YEAR
                    PROBATION:  1 YEAR / UNSUPERVISED
                    NOTE: CASE DISMISSED 10/09/1998

While not decided in the eighth circuit, the majority of Circuit Courts have

adopted the "maximum possible accuracy approach" which holds that an entry can be

"incomplete or inaccurate" within the meaning of the FCRA either "because it is patently

incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect . . . decisions." Smith v. HireRight Solutions, Inc., 711 F. Supp.2d 426, 433 (E.D. Pa. 2010)(citing Sepulvado v. CSC Credit Svs., Inc., 158 F.3d 890, 895 (5th Cir. 1998); Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1163 (9th Cir. 2009); Stauders v. Branch Banking and Trust Co. of VA, 526 F.3d 142, 148 (4th Cir. 2008); Koropoulos v. Credit Bureau, Inc., 734 F.2d 37, 40 (D. D.C. 1984); Smith v. HireRight Solutions, Inc., 711 F. Supp. 2d 426, 433–34 (E.D. Pa. 2010)).  Further, "[T]he plain language of the statute places the burden of reinvestigation on the consumer reporting agency.  The FCRA evinces Congress's intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, 'bear grave responsibilities' to ensure the accuracy of the information." Cushman v. Trans Union Corp., 115 F.3d 220, 225 (3d Cir. 1997)(internal citations omitted).  Regarding Martin's arrest in 1997, the entry on the report contains several different pieces of information.  It is grossly inaccurate that Martin was found "GUILTY" on October 9, 1998 or on September 15, 1997.  (See Mahlon Decl. Ex. (a).) It is also grossly inaccurate that Martin was sentenced to one year in jail.[9]  (Id.)

---

[9] Had the history of Martin's arrest been reported correctly, he would not have been disqualified from employment with WF or as a mortgage loan originator.  Even assuming that the charge qualifies as a criminal offense involving dishonesty or breach of trust, see 12 U.S.C. § 1829(a)(1)(A), it qualifies as a de minimis offense, for which a Section 19 application under FIRREA is not required and automatically granted.  See 63 Fed. Reg. 66,185 (Dec. 1, 1998); see also Minn. Stat. §§ 58.125, 58A.05.  Further, as set forth by WF's own policy handbook, neither Martin's actual arrest, or even the erroneous information contained in the February 1, 2011 consumer report, prohibit Martin from receiving bond coverage.  (See Spak Decl. Ex. 2 at 12.)

As FABSC cannot argue that the notations regarding the disposition or sentence as inaccurate, FABSC takes issue with the brief description provided by Martin arguing it was insufficiently clear.  (See FABSC Mem. at 11–14.)  FABSC ignores, however, that the information written by Martin is in response to a line reading: "Please provide a description of the information that you are disputing referencing case number as necessary." (Spak Decl. Ex. 3.)  That is exactly what Martin did: he *described* the information that he was disputing.  FABSC's form does not indicate that Martin was supposed to "*explain why*" he was disputing the information.  The position taken by FABSC is wholly contrary to the remedial purposes of the FCRA.  Cf. Cortez v. Trans Union, LLC, 617 F.3d 688, 715 n.33 ("Congress does not require that consumers submit disputes on specific forms, and any such technical requirement seems inconsistent with the remedial focus of the FCRA.")(citations omitted).

A reasonable reinvestigation would certainly reveal that the information regarding Martin's 1997 arrest was inaccurate.  A simple review of the court records make clear that Martin was neither found "guilty" of the charge, and that he was not sentenced to one-year in jail, which is impossible under Minnesota law.  The crime with which Martin was charged—and never convicted—was a misdemeanor, punishable up to 90 days in jail and/or up to a $700.00 fine.  See Minn. Stat. §§ 609.475, 609.02, Subd. 3.  FABSC's failure to reasonably reinvestigate is made further evident by the fact that Martin had previously undergone two background searches for WF (one when he was hired as a contract employee, and later when he was hired as a WF employee) and neither report

apparently noted the erroneous information contained in the February 1, 2011 consumer report.

Finally, "questions regarding the reasonableness of an investigation are best for a jury to determine." Meyer v. F.I.A. Card Services, N.A., 780 F. Supp. 2d 879, 883 (D. Minn. 2011)(citing Guimond v. Trans Union Credit Info. Co., 45 F.3d 1329, 1333 (9th Cir. 1995)). Martin is entitled to discovery regarding FABSC's alleged reinvestigation, and dismissal is precluded.

## CONCLUSION

Plaintiff respectfully requests that the Court Deny Defendants' Motions to Dismiss in their entirety. Should the Court grant either or both of Defendants' Motions, Plaintiff respectfully requests that the dismissal be without prejudice, and Plaintiff be granted leave of Court to amend the pleadings.

Dated this 11th day of January, 2012  BAILLON, THOME, JOZWIAK,
               MILLER & WANTA, LLP


               s/Daniel Gray Leland
               Joni M. Thome, # 232087
               Daniel Gray Leland, # 389027
               222 South Ninth Street
               Suite 2955
               Minneapolis, MN 55402
               Tel.: (612) 252-3570
               Fax: (612) 252-3571

               *Attorneys for Plaintiff*