IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Mahlon Martin,<br><br>                  Plaintiff,<br><br>     v.<br><br>First Advantage Background Services<br>Corp. and Wells Fargo Bank, NA,<br><br>               Defendants. | Other:  Civil<br><br>Court File No. 0:11-cv-03357-MJD-LIB<br><br>**FIRST ADVANTAGE'S<br>MEMORANDUM OF LAW IN<br>SUPPORT OF ITS MOTION FOR<br>SUMMARY JUDGMENT** |

## FIRST ADVANTAGE'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

In February 2011, human resources personnel at Wells Fargo reviewed a First Advantage background report about Mahlon Martin.  They concluded that Martin's criminal record made him ineligible to work at the bank under new FDIC regulations.

Those FDIC regulations, which were implemented in 2011 in response to the subprime mortgage crisis of 2008, have attracted widespread criticism and caused thousands of banking employees to lose their jobs.[1]

Martin sued Wells Fargo and First Advantage in October 2011.  Discovery has since established that:  1) Martin was actually eligible to work, despite his criminal record; 2) Wells Fargo and First Advantage both made mistakes that caused Wells Fargo to conclude otherwise; and 3) Wells Fargo and First Advantage were acting reasonably, in good faith, and in compliance with law when they made those mistakes.

---

[1] *See* Spak Dec. at Ex. A (reporting the story of Richard Eggers, whose conviction for using a fake dime in a laundromat in 1963, when he was 18, forced Wells Fargo to fire him in 2012, when he was 68).

Martin's legal claims against First Advantage fall into two broad categories:  i) eight claims that First Advantage made a mistake when it created a report about him; and ii) two claims that First Advantage did not respond appropriately when he disputed its report.  But they all present the same underlying question:  if First Advantage acted reasonably, in good faith, and in compliance with law – and the facts will show that it did – can it nevertheless be found liable for Wells Fargo's decision to fire him?

This memorandum will demonstrate that as a matter of law, First Advantage cannot be liable on any of Martin's ten legal claims:

•      Counts I, II, and III allege that First Advantage violated the Fair Credit Reporting Act, 15 U.S.C. § 1681, which regulates "consumer reports."  This memorandum will show that the Martin report is not a "consumer report" under 15 U.S.C. §§ 1681a(d) and §1681a(y), so these FCRA claims fail as a matter of law.

•      Counts IV and VII allege that First Advantage violated the FCRA and a related Minnesota statute when, in response to a dispute from Martin, it did not correct an error in its report.  This memorandum will show that Martin's dispute did not identify the error; that Martin admitted that it was "not unreasonable" when First Advantage did not correct an error that he did not identify; and that neither the statutory text nor the case law required First Advantage to intuit something that Martin did not say.

•      Count VI alleges that First Advantage violated a Minnesota statute which requires criminal background reports to be based on information which has been updated within 30 or 90 days.  This memorandum will show that First Advantage based its report on information which it obtained within 10 days, so Count VI fails as a matter of law.

• Count VIII alleges that First Advantage defamed Martin by providing Wells Fargo with a report that contained one inaccuracy. This memorandum will show that because First Advantage provided the report on a proper occasion, for a proper purpose, and on probable cause – without malice and with Martin's prior consent – the report was privileged and cannot be subject to a defamation claim.

• Counts IX, X, and XI allege that First Advantage is liable for negligence, negligence per se, and intentional infliction of emotional distress. Case law shows that these claims duplicate the claim for defamation and should be dismissed as redundant.

Judge Montgomery of this Court has previously explained why a defendant like First Advantage should not be liable to a plaintiff like Martin. *Schmitt v. Chase Manhattan Bank*, *NA*, No. 03-3295, 2005 U.S. Dist. LEXIS 18029 (D. Minn. Aug. 23, 2005). In *Schmitt*, the plaintiff sued a bank and several consumer reporting agencies for FCRA violations, after they mistakenly said that she was deceased and then failed to correct the mistake despite numerous requests. This Court agreed that the reporting agencies had made mistakes, but it nevertheless granted them summary judgment:

> The FCRA requires consumer reporting agencies, such as Trans Union and CSC, "adopt reasonable procedures for meeting the needs of commerce …." 15 U.S.C. 1681(b). However, "reasonable procedures" does not require total accuracy, as is reflected in the fact that the FCRA is not a strict liability statute ….
>
> Both Trans Union and CSC have well-established procedures in place to ensure accuracy …. ***The only conclusion that can be drawn from the undisputed facts is that Plaintiff was the victim of a series of unfortunate circumstances leading to the erroneous reporting*** ….
>
> It would be unreasonable to require a consumer reporting agency to develop systems that would catch infrequent and irregular mistakes that furnishers

might make. The Act does not impose such requirements. Its goal is to have consumer reports that are fair and accurate; it does not demand perfection from an industry that deals in billions of pieces of information.

Because both Trans Union and CSC employed systems and procedures reasonably designed to limit the amount of errors in credit reports, and because both Trans Union and CSC reasonably investigated Plaintiff's disputes, both Motions for Summary Judgment are granted.

*Schmitt*, 2005 U.S. Dist. LEXIS 18029, at **9-14 (emphasis added) (citation omitted).

Like the defendants in *Schmitt*, First Advantage had reasonable procedures in place: this memorandum will show that they are uncontested, and they create accurate reports more than 99.975% of the time.  If this were a typical FCRA case, First Advantage, like the defendants in *Schmitt*, could not be found liable, because while Martin "was the victim of a series of unfortunate circumstances," First Advantage did not violate the law.

Unlike *Schmitt*, this is not a typical FCRA case.  It involves criminal reports, not credit reports, and the reports are exempt from the FCRA under 15 U.S.C. § 1681a(y).  But these distinctions make First Advantage more entitled, not less, to summary judgment in its favor.  First Advantage was providing a service – creating reports that Wells Fargo needs to comply with a federal law that combats mortgage fraud – which both the FCRA and the common law deem worthy of robust protection.

Bad laws make hard cases.  The federal regulations that gave rise to this case are arguably bad laws, and Martin is undoubtedly a sympathetic figure.  But First Advantage acted reasonably and in compliance with law, and judgment should be granted in its favor accordingly.

- 4 -

## STATEMENT OF FACTS

**1.    In 1997, Mahlon Martin Committed a Crime of Dishonesty.**

In May 1997, Martin had a sheriff's uniform in his car, but he was not a sheriff. Spak Dec. at Ex. B (Martin Dep.) at 84-85.  On May 29, 1997, the police arrested Martin and charged him with a felony.  *Id*. at 86. [2]

On September 15, 1997, Martin agreed to a plea deal:  he would plead guilty to impersonating a police officer, which is a misdemeanor; the court would suspend any sentence and order him to serve one year of unsupervised probation; and, if he completed probation without incident, the court would dismiss the matter.  *Id*. at 87.

Martin completed the probation without incident, and the court dismissed the matter on October 9, 1998.  *Id*. at 89-90.  Martin assumed but did not know that the court had dismissed the matter.  *Id*.  The matter was not expunged at that time. *Id*. at 17:10-21.

**2.    In 2009, Martin Took a Job with Wells Fargo.**

On June 24, 2009, Martin applied for work at Wells Fargo.  In the application, he was asked if he had ever been convicted of a crime involving dishonesty or breach of trust.  He answered "no."  *Id*. at 95:1-7 and at Ex. C-4.  This was untrue – he had been convicted of impersonating a police officer.  *See*, *e.g.*, *id.* at 95 (admitting that it was

---

[2]Martin thought that he was charged with impersonating a police officer.  *See* Spak Dec. at Ex. B (Martin Dep.) at 85.  But that is a misdemeanor, not a felony.  Minn. Stat. § 609.475.  The most likely felony charge appears to be intentionally exercising a function of a public office, Minn. Stat. § 609.44, which is a felony because it can be punished by a year in jail or a fine of $3,000.  *Id*.; *see also* Minn. Stat. § 609.0341 (defining felony by sentence).  Martin later obtained criminal records from the Ramsey County courthouse, which indicate that he committed an offense on May 29, 1997, but they do not indicate what the initial charge was.  Spak Dec. at Ex. B (Martin Dep.) at 17:7-10 (authenticating records) and at Ex. C-3 (copy of records).

untrue); at 82:19-23 and at Ex. C-30 (describing later telling the FDIC that he had been convicted); at 91:18-20 and at Ex. C-14 thereto (admitting conviction in a later petition for expungement); *see also id.* at 87:10-16 (admitting to having pleaded guilty); Minn. Stat. § 609.02(5) (defining "conviction" to include a plea of guilty).

From October 2010 until February 2011, Martin worked as a "mortgage loan originator" for Wells Fargo, taking mortgage applications and negotiating loan terms. Spak Dec. at Ex. B (Martin Dep.) at 28-30 and at Ex. C-9 (describing work duties in position called "telesales specialist"); *id*. at 32 (describing dates of work).

### 3.   Federal Law Required Wells Fargo to Obtain FBI Reports and to Screen Employees for Crimes of Dishonesty.

On July 30, 2008, the United States enacted a law pertaining to mortgage originators – the Secure and Fair Enforcement for Mortgage Licensing Act of 2008 ("SAFE Act"), 12 U.S.C. § 5101 *et seq*.  It established a "nationwide mortgage licensing system and registry" through which mortgage originators could obtain state licenses, which were now required to work in the field.  *See* 12 U.S.C. § 208.102(b) (defining mortgage originator); 12 U.S.C. § 5102(6) (defining registry).  To obtain a license, the mortgage originators had to:  1) provide the registry with the results of a fingerprint-based background check by the FBI (12 U.S.C. § 5104(a)(1)); and 2) allow the registry to obtain a more general criminal background report (*id*. at § 5104(a)(2)(B)).  Because Wells Fargo employed mortgage originators, it had to ensure that they underwent this process, and it could not continue to employ them unless they did so.  12 C.F.R. § 208.103(a)(2).

- 6 -

Wells Fargo also had to develop a process through which it would review the results of these background reports – the FBI report at 12 U.S.C. § 5104(a)(1) and the more general report at § 5104(a)(2)(B) – to determine whether a mortgage originator was eligible to work for the bank.  There are two federal laws which may prohibit a bank from employing someone with a certain kind of criminal record.  They are the SAFE Act and Section 19 of the Federal Deposit Insurance Act (12 U.S.C. § 1829) ("Section 19").  The SAFE Act required banks to check a mortgage originator's compliance with both.  12 C.F.R. §34.104(g, h); *see also* Spak Dec. at Ex. D (Gates Dep.) at 22-23.

Under the SAFE Act, Wells Fargo could not employ a mortgage originator who had ever been convicted of a felony which "involved an act of fraud, dishonesty, or a breach of trust, or money laundering."   12 U.S.C.  §  5104(b)(2).   The goal of this provision was to combat fraud in the subprime mortgage industry, which had helped to cause a severe financial crisis in 2008.  *See* 12 U.S.C. § 5101(4, 6, 8, 9).

Under Section 19, Wells Fargo could not employ anyone who had been convicted of a dishonesty crime, or had gone through pretrial diversion regarding such a crime.  12 U.S.C. § 1829(a)(1).  If Wells Fargo employed such a person without FDIC consent, it would be subject to fines of up to $1,000,000.  12 U.S.C. § 1829(b).

If an individual's criminal record technically violated Section 19 but appeared insubstantial, then the individual qualified for a "de minimis" exception:  Wells Fargo could employ the individual, because the FDIC's consent was presumed.  Employees qualified for the "de minimis" exception if they: i) had committed one offense; ii) the offense was punishable by a fine of less than $1,000 and a jail term of less than one year,

and no jail time was served; iii) any sentence was entered at least five years before the individual began working; and iv) the offense did not involve a bank.  Spak Dec. at Ex. D (Gates Dep.) at 31-32 and at D-12 (63 Fed. R. 66, 177) at 66, 185.

The SAFE Act required Wells Fargo to screen mortgage loan originators between January 31 and July 29, 2011.  *See* 12 C.F.R. § 208.103(a)(3); http://www.ffiec.gov/safeact.htm; *see also* Spak Dec. at Ex. D (Gates Dep.) at 9:16-20 (stating that Wells Fargo began screening employees to comply with the SAFE Act in January 2011).  The SAFE Act provided no exception for existing employees, even if those employees had previously undergone background checks. 12 C.F.R. § 208.103(a)(2); *see also* Spak Dec. at Ex. D (Gates Dep.) at 28:12-23.   Wells Fargo screened employees for dishonesty crimes that might affect compliance with the SAFE Act and Section 19.  Spak Dec. at Ex. D (Gates Dep.) at 22-23.  It also screened employees for other crimes that might affect Wells Fargo's ability to obtain a fidelity bond required by 12 U.S.C. § 1815(c).  *See id*. at 30:14-22.

Wells Fargo hired First Advantage to provide the reports that it needed.  O'Connor Dec. at ¶ 3 (citing contract at Ex. K); *see also* 28 C.F.R. § 906.2 (permitting contractors like First Advantage to obtain FBI reports for entities like Wells Fargo).

**4.   First Advantage Created a Report about Martin.**

Martin was informed that, in order to comply with the SAFE Act, he had to be fingerprinted and had to submit to a background check.  Spak Dec. at Ex. B (Martin Dep.) at 32.  Martin gave consent to allow First Advantage to check his background and provide a report to Wells Fargo.  *Id*. at 32-33, 34-35 and at Exs. C-11, C-12.

First Advantage created a background report about Martin pursuant to its contract with Wells Fargo.  Broom Dec. at ¶ 5.  The contract required First Advantage to obtain Martin's fingerprints, send them to the FBI, receive records which, according to the FBI, matched Martin's fingerprints, and provide those records to Wells Fargo.  *Id*.  If the FBI's records were incomplete – if they said that Martin had been charged with a crime, but they did not say if the charges were dismissed, if he were convicted, or if he went through a "pretrial diversion" under Section 19 – then the contract required First Advantage to supplement the CHRI by contacting the courts listed in the CHRI to obtain complete information.  *Id*. at ¶¶ 6, 8; O'Connor Dec. at Ex. K (calling this process "rap sheet reconciliation" at FABSC 62 and 83).

The FBI reported that a 1997 charge for aggravated assault in Ramsey County, MN matched Martin's fingerprints.  Broom Dec. at ¶¶ 16-17 and at Ex. A (report) at FABSC 13.  Because the FBI did not indicate the disposition of this charge, the contract required First Advantage to investigate the underlying criminal records – a "rap sheet reconciliation" – in an effort to answer this open question.  *Id*.

First Advantage used a dedicated four-member team to conduct rap sheet reconciliations.  Each team member went through two weeks of training before formally starting work.  Broom Dec. at ¶¶ 9-10.  At work, the team members were required to gather information from court records or equally credible sources to determine the outcome of a charge reported by the FBI.  *Id*. at ¶ 11.  After gathering the information, they entered it into a computer system which eventually created a final report for Wells Fargo.  *Id*. at ¶¶ 11, 15.  During the entire process, team members were encouraged to

- 9 -

pose questions to one another or to their manager, and each team member's work was double-checked before any of the work was used to create a report. *Id.* at ¶¶ 12, 14, 15. The process was time-consuming (*id.* at ¶ 15) but highly accurate:  First Advantage's reports are accurate more than 99.975% of the time.  O'Connor Dec. at ¶¶ 4-7.

In performing a "rap sheet reconciliation" about the incomplete charge that the FBI reported for Martin, First Advantage team members contacted the courthouse in Ramsey County, MN and asked how to obtain Martin's criminal records.  Broom Dec. at ¶¶ 10, 18 and at Ex. D.  At the direction of courthouse personnel, First Advantage sent a records request by mail on January 21, 2011.  *Id.*  The records that First Advantage received showed that Martin's aggravated assault charge was dismissed, but that Martin had been convicted of impersonating an officer.  *Id.* at ¶¶ 19-21.

A First Advantage employee took information from these records and input it into First Advantage's computer system; another employee checked that work; and First Advantage then used the computer system to create a report about Martin for Wells Fargo.  *Id.*  FABSC's report about Martin stated as follows:

COURT SERVICES

COMMENTS: Criminal court records were researched in
RAMSEY County, MN, with the following results obtained:

COURT             :     RAMSEY DISTRICT-(F&M)
DATE              :     1/12/1985-1/12/2011
RESULTS           :     RECORDS FOUND

CASE NUMBER       :     62-TX-97-041983
Type              :     MISDEMEANOR
Date Filed        :     6/27/1997
Charge            :     IMPERSONATING A OFFICER

| | | |
|---|---|---|
| Offense Date | : | |
| Arrest Date | : | 5/29/1997 |
| Disposition | : | 10/9/1998 GUILTY |
| Sentence | : | GUILTY: 09/15/1997 |
| | | JAIL: 1 YEAR |
| | | PROBATION: 1 YEAR/ UNSUPERVISED |
| | | NOTE: CASE DISMISSED 10/09/1998 |

Broom Dec. at Ex. A (FABSC 4); *see also* Spak Dec. at Ex. B (Martin Dep.) at 36-37 and at Ex. C-13 (testifying to receiving report).

First Advantage believed that this information was accurate. Broom Dec. at ¶ 23; O'Connor Dec. at ¶ 8.

Martin was asked at his deposition to compare this First Advantage report to criminal records he obtained from Ramsey County. Spak Dec. at Ex. B (Martin Dep.) at 96-101 and at C-3, C-13. He did so and agreed that the majority of the report was correct. *Id.* He contended that the sentence "JAIL: 1 YEAR" was inaccurate, but he did not contend that any other portion was inaccurate. *Id.* at 106-07.

**5.     Wells Fargo Reviewed the First Advantage Report and Terminated Martin.**

Wells Fargo reviewed the First Advantage report and concluded that Martin's criminal records made him ineligible to continue working, because: i) he had committed a dishonesty crime in 1997; and ii) the penalties associated with that crime were too severe for the "de minimis" exception to apply. Spak Dec. at Ex. D (Gates Dep.) at 38-39. Mistakenly, and apparently due to the "TX" in the Ramsey County case number for Martin's impersonating an officer offense (62-TX-97-041983), Wells Fargo applied Texas law, not Minnesota law, to determine whether Martin qualified for "de minimis." *Id.* at 42-44 and a D-3, p. WF865.

Specifically, Wells Fargo concluded that the "de minimis" exception did not apply because either:  a) under Texas law (which it incorrectly applied), the maximum fine for the crime was $2,000, but "de minimis" only applied where the fine is $1,000 or less; or b) Martin had been sentenced to a year in jail, but "de minimis" only applied where the sentence is less than one year.  Spak Dec. at Ex. D (Gates Dep.) at 47-48.

In summary, two errors led to Martin's termination:  the First Advantage report should not have said "JAIL:  1 YEAR," and Wells Fargo should not have applied Texas law.  Wells Fargo gave Martin received notice of termination on February 4, 2011.  *Id*. at pp. 47-48, 58-59 and at D-3, p. WF865; *see also* Spak Dec. at Ex. B (Martin Dep.) at 38.

## 6.      Martin Disputed the First Advantage Report.

On the day he was terminated – February 4, 2011 – Martin went to the Ramsey County courthouse, paid $14 for a copy of his criminal records, and applied to have records of the impersonating an officer offense expunged.  Spak Dec. at Ex. B (Martin Dep.) at 17, 43, 62 and at Exs. C-3, C-14.  The court ordered expungement on or around April 20, 2011.  *Id.* at 62-64.

On April 22, 2011, Martin disputed First Advantage's report by completing and then faxing a dispute form to First Advantage.  Martin's explanation of his dispute stated, in its entirety, that:

> The charge ~~with~~ for impersonating officer was vacated & dismiss by the Ramsey County court's citation #97920613 court file #632-TX-97-041983.

Spak Dec. at Ex. B (Martin Dep.) at 67-68 and at C-25; *see also* Webb Dec. at ¶ 4 and at Ex. F.

First Advantage required the employee who received this dispute form to reinvestigate the precise issue that Martin was disputing.  Webb Dec. at ¶¶ 5-7.  The employee was not to determine whether every item of information in the report was accurate:  a report could contain more than 100 lines of information, and reviewing each of them, if only one or two were in dispute, would unduly delay the process of getting disputes resolved.  *Id.* at ¶ 6.

A First Advantage employee therefore reviewed Martin's April 2011 dispute and determined that:

> The consumer disputed case 62-TX-97-041983 claiming the case was dismissed.  We reported this case as being dismissed on 10/9/1998.  There will be no change to our reports … as the information is correct per the consumer.

*Id.* at Ex. J.

Martin was asked to review these notes during his deposition and indicate whether the employee's decision was unreasonable.  Spak Dec. Ex. B (Martin Dep.) at 221-25 and at C-27.  He stated that it was not unreasonable.  *Id.*

### 7.  Martin's Record Was Expunged and His Report Was Corrected.

Martin filed this lawsuit in October 2011.  ECF No. 1-1.  In March 2012, Martin sent a second, and much more detailed, dispute form to First Advantage.  Spak Dec. at Ex. B (Martin Dep.) at 75-77 and at Ex. C-28.  This second form disputed, *inter alia*, whether Martin had been convicted of impersonating an officer, whether he had been sentenced to one year in jail, and whether his record had been expunged.  *Id.*  A First Advantage employee attempted to obtain a current copy of the court records to

reinvestigate these issues and was told that there were no such records due to the expungement.  Webb Dec. at Ex. J.  Accordingly, First Advantage changed its report and deleted any reference to the 1997 impersonating an officer offense.  *Id.* at Ex. J, Ex. I.

**8.      Martin Sought Information from the FDIC but not from First Advantage.**

While this litigation was in progress, Martin asked the FDIC to opine whether the impersonating an officer offense met the "de minimis" criteria such that Wells Fargo had to terminate him.  The FDIC did so and concluded that Martin met the "de minimis" exception.  Spak Dec. at Ex. B (Martin Dep.) at 81-83 and at Ex. C-30.

Martin took no depositions of any First Advantage employees.  He stated that he knew nothing about First Advantage's policies and procedures for creating reports and resolving disputes.  *Id.* at 103-04, 109-10.  He testified that he had no reason to believe that First Advantage intended to harm him.  *Id.* at 115-16.

## STANDARD OF REVIEW

> Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law….  On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts….  The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial.

*Wood v. SatCom Mktg., LLC*, 705 F.3d 823, 828 (8th Cir. 2013) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011)).

**ARGUMENT**

Judgment should be entered in favor of First Advantage on each of Martin's ten claims against it for the reasons set forth in detail below.  In summary:

- Martin's first three FCRA claims fail because the report at issue was not a "consumer report" as the FCRA defines that term;

- Martin's defamation claim fails because the report at issue was privileged, and because Martin consented to the report;

- Martin's claims for negligence, negligence per se, and intentional interference with contract are redundant duplications of the defamation claim;

- The report at issue was based on current data and thus complied with Minnesota statutory law; and

- First Advantage conducted a reasonable investigation in response to Martin's April 2011 dispute, so it complied with the FCRA and Minnesota law.

**1.     Martin's first three FCRA claims fail because First Advantage did not create a "consumer report" for Wells Fargo.**

Martin's first three claims allege that First Advantage violated FCRA provisions which regulate "consumer reports" as the FCRA defines that term.  *See* ECF No. 32 at Count I (alleging violation of 15 U.S.C. § 1681e(b)); Count II (§ 1681k(a)(2)); and Count III (§ 1681c(a)(5)).

A "consumer report" is a report "bearing on a consumer's … personal characteristics [and] establishing the consumer's eligibility for … employment purposes." 15 U.S.C. § 1681a(d)(1)(B).  However, if the report has to do with "suspected

misconduct relating to employment" or "compliance with … laws and regulations," then it is a "communication for employee investigation" and is not a "consumer report."  15 U.S.C. § 1681a(y)(1)(B).

In a prior opinion, this Court discussed whether First Advantage's report about Martin was a "consumer report" or a "communication for employee investigation":

> A key issue in this case is therefore whether [First Advantage's] report was made to Wells Fargo "in connection with an investigation of . . . suspected misconduct related to employment; or compliance with Federal, State, or local laws and regulations, the rules of a self-regulatory organization, or any preexisting written policies of the employer." 15 U.S.C. § 1681a(y)(1)(B). If it was, the exemption applies, and Plaintiff's claims on Counts I, II, III and V cannot succeed because the FCRA provisions which underlie those claims apply only to "consumer reports" ….

> The Court must conclude that a report received and used in connection with an investigation into the employer's compliance with laws, regulations, or preexisting written internal policies is sufficient to trigger the exemption ….

> Whether or not the report at issue in this case qualifies as a consumer report depends on the circumstances surrounding Wells Fargo's decision to obtain it. That information is uniquely in the hands of Wells Fargo, and it would not be appropriate for this Court to examine selected pieces of evidence submitted by Defendants without allowing Plaintiff the benefit of discovery.  For these reasons, the Court denies Defendants' motions to dismiss Counts I, II, III, and V.

ECF No. 31 at 7-8, 10, 15.

Wells Fargo "received and used [First Advantage's report] in connection with an investigation into [] compliance with laws."  A Wells Fargo employee testified that Wells Fargo used the First Advantage report to comply with the SAFE Act.  Spak Dec. at Ex. D (Gates Dep.) at 21-22.  Martin also testified that Wells Fargo obtained and used his report

for that purpose.   Spak Dec. at Ex. B (Martin Dep.) at 61 and at Ex. C-22.   A First Advantage employee has said the same.   Broom Dec. at ¶ 5.

Because Wells Fargo received and used First Advantage's report to comply with the SAFE Act, the report is not a "consumer report" as the FCRA defines that term. Plaintiff's first three FCRA claims – Counts I, II, and III – fail unless First Advantage's report was a "consumer report," so judgment should be granted in favor of First Advantage as to those three claims.

**2.      Martin's Defamation Claim Fails because First Advantage's Report Was a Privileged Communication.**

Martin's claim for defamation fails as a matter of law.   "Defamation under Minnesota law requires proof that the alleged defamatory statement (1) was communicated to someone other than the plaintiff, (2) was false, and (3) tended to harm the plaintiff's reputation and lower [him] in the estimation of the community." *Chambers v. Travelers Cos.*, 668 F.3d 559, 564 (8th Cir. 2012).   Privilege is a defense to defamation; if it applies, the plaintiff must prove the three elements above and also that the defendant acted with malice.   *Id.*

Minnesota courts have considered reports about employees to be privileged for more than a century.   *See*, *e.g.*, *Hebner v. Great Northern Ry. Co.*, 80 N.W. 1128, 1129 (Minn. 1899) (describing such reports as "highly privileged" and their creation to be "a matter of duty to the public"); *McBride v. Sears, Roebuck & Co.*, 235 N.W.2d 371, 374 (Minn. 1975) (following *Hebner* and applying the privilege to "[c]ommunications

between an employer's agents made in the course of investigating or punishing employee misconduct"); *Chambers*, 668 F.3d at 564 (following *McBride*).

There are two ways of expressing the test for the privilege.  The most common version asks whether the report was "made upon a proper occasion, from a proper motive, and [] based upon reasonable or probable cause." *Chambers*, 668 F.3d at 564.  Another version asks whether "the statement was made in good faith by a speaker who had an interest or duty with respect to the subject matter to a person having a corresponding interest or duty." *Thompson v. Olsten Kimberly Qualitycare*, 33 F. Supp. 2d 806, 815-16 (D. Minn. 1999) (holding that reports to state nursing board were privileged because state law required such reports).  Whether the privilege applies is a matter of law for this Court to decide. *Chambers*, 668 F.3d at 564.

The report at issue here was privileged under either test.  First Advantage acted on a proper occasion and from a proper motive:  it furnished Wells Fargo with information that the SAFE Act required.  First Advantage also acted with "reasonable cause" or "in good faith," in that it only published the report after following a time-intensive investigative process which met or exceeded an accuracy rate of 99.975%. *See Rudebeck v. Paulson*, 612 N.W.2d 450, 454 (Minn. App. 2000) ("Reasonable grounds can exist if a person has valid reasons for believing a statement, even though the statement later proves to be false.  In determining whether the statements were supported by reasonable or probable cause, courts will examine whether the employer took investigative steps") (citations omitted).

First Advantage's report about Martin was privileged as a matter of law. As such, Martin's defamation claim fails unless First Advantage acted with malice. Because Martin has no evidence of malice, his defamation claim should be dismissed.

3.   **Martin's Defamation Claim Fails Due to Martin's Consent.**

In the alternative, First Advantage is protected from Martin's defamation claim by consent, which is an absolute defense to defamation. *Otto v. Charles T. Miller Hospital*, 115 N.W.2d 36, 40 (Minn. 1962). Martin consented to the First Advantage report by completing a form during his employment at Wells Fargo. Exs. 7 and 8.

Martin did not know exactly what First Advantage's report would contain when he gave his consent, but the consent defense still applies. *Williamson v. Stocker*, No. 4-79-335, 1982 U.S. Dist. LEXIS 16409, at *9 (D. Minn. Dec. 21, 1982). In *Williamson*, the plaintiff's employer asked him to submit to evaluation of possible alcohol dependency. The plaintiff agreed and signed several forms in which he consented to the evaluators' release of their conclusions. The evaluators concluded that plaintiff was alcohol-dependent and informed his employer and insurer of this fact. The plaintiff sued for defamation and alleged that the evaluators' conclusions were incorrect. The court granted summary judgment for the defendants, stating:

> The mere fact that Williamson consented to release in advance of the formation of defendants' diagnoses or findings does not vitiate his consent to publication of those diagnoses and findings …. Although Williamson contends that defendants' diagnoses and findings were in error and could have been avoided by diligent investigation, there is no suggestion that the findings were not the honest conclusions of the defendants.

*Id*. at *9.

- 19 -

Martin consented to First Advantage's background report and its disclosure to Wells Fargo.  Spak Dec. at Exs. C-11, C-12.  Like the plaintiff in *Williamson*, Martin alleges that First Advantage's report contained errors, but he does not and cannot allege that these alleged errors were anything other than the honest conclusions of First Advantage as to what his criminal record contained.  As a result, the absolute defense of consent applies, and Martin's claim of defamation should be dismissed.

**4.      Martin's Remaining Common-Law Claims Fail because They Duplicate the Defamation Claim.**

Martin pled three common law claims in addition to defamation:  for negligence and negligence per se (Counts IX and X) and for tortious interference with contractual relations (Count XI).  These claims should be dismissed as redundant.

Martin's claims for negligence and negligence per se (Counts IX and X) should be dismissed because they duplicate the claim for defamation (Count VIII).[3]  *See MSK EyEs, Ltd. v. Wells Fargo Bank, NA*, 546 F.3d 533 (8th Cir. 2008).  In *MSK*, the plaintiffs sued Wells Fargo for both defamation and negligence, alleging that it made inaccurate and harmful statements about their loan account with Wells Fargo.  The district court found that "the negligence claim stemmed from the allegedly defamatory communications" such that it was not a distinct claim.  *Id.* at 545.

On appeal, the plaintiffs argued that the negligence claim was based on Wells Fargo's alleged "negligent handling of information contained in its internal accounting

---

[3]Martin's claim for negligence per se (Count X) also assumes that First Advantage violated Minn. Stat. § 332.70 as described in Counts VI and VII.  *See* ECF No. 32 at ¶¶ 86, 90, 109.  This brief will argue below that Counts VI and VII should be dismissed on their merits, in which case Count X, which duplicates them, should also be dismissed.

systems." *MSK*, 546 F.3d at 545.  But the Eighth Circuit rejected this argument because: i) Wells Fargo owed no duty to keep accurate internal information; and ii) the proximate cause of the alleged injury was not retaining the information but publishing it – which was the alleged defamation.  *Id*.

In short, when Martin claims that First Advantage "was negligent in preparing and distributing its report," ECF No. 32 (Complaint) at ¶ 102, he is alleging defamation using other words.  His two negligence claims should be dismissed for this reason.

Martin's claim for tortious interference with contractual relations (Count XI) fails for two reasons.  First, it duplicates the claim for defamation:  Martin's claim appears to be that First Advantage interfered with his contract by defaming him.  In Minnesota, "when the same defamation forms the basis of both a tortious interference and defamation claim, the tortious interference claim is encompassed by the defamation claim." *American Iron and Supply Company, Inc. v. Dubow Textiles*, No. C1-98-2150, 1999 Minn. App. LEXIS 566 (Minn. Ct. App. May 25, 1999) (unpublished) (following *Wild v. Rarig*, 234 N.W.2d 775, 793 (Minn. 1975)).  Martin's claim for tortious interference should therefore be dismissed as duplicative.

In addition, intent is an element of this claim, and the absence of intent defeats it. *Witte Transp. Co. v. Murphy Motor Freight Lines, Inc*., 193 N.W.2d 148, 151-52 (Minn. 1971) (reversing verdict for plaintiff on tortious interference claim where "there was no actionable wrong because there was no intentional wrongful act").  Because Martin has no evidence that First Advantage intended to harm him, his claim of intentional interference should be dismissed.  Spak Dec. at Ex. B (Martin Dep.) at 115-16.

- 21 -

**5.      Martin's First MBSSA Claim Fails Because the Report Was Current.**

The first of Martin's two claims under the Minnesota Business Screening Services Act ("MBSSA") (Count VI) alleges that First Advantage's report "violated the accuracy requirements of Minnesota Statutes § 332.70, Subd. 2."  *See* ECF No. 32 at p. 13, ¶ 86. That provision of the MBSSA states that:

> A business screening service must only disseminate a criminal record that reflects the complete and accurate record provided by the source of the data.  A complete and accurate record is a record that has:
> (1) been updated within 30 days of its receipt; or
> (2) been verified with the source of the data within the previous 90 days as being up-to-date.

Minn. Stat. § 332.70(2).

First Advantage complied with the MBSSA as written.  The MBSSA regulates a common industry practice, in which reporting agencies keep their own computer databases of publicly-reported criminal records, and then use these databases to create reports upon request.  If the information in the computer database is out of date, the report may be inaccurate, so the MBSSA states that a report is "complete and accurate" if the information in it has been updated within a certain time period.

First Advantage did not use a computer database to create its report here.  It requested records from Ramsey County, MN on January 21, 2011, and it used those "fresh" records to create a report ten days later, on January 31, 2011.  Broom Dec. at ¶¶ 18, 22; *see also id.* at Ex. D (FABSC 53-54) (showing records requests from Jan. 19-21, 2011) and at Ex. A (FABSC 003) (showing completion date of Jan. 31, 2011).  By doing so, First Advantage complied with the MBSSA at Minn. Stat. § 332.70(2).

**6.** **Martin's Claims for Improper Reinvestigation Should Be Dismissed because First Advantage Properly Investigated the Only Issue that Martin Disputed.**

Martin's fourth FCRA claim (Count IV), and second MBSSA claim (Count VII) both ask whether First Advantage responded appropriately to a dispute that Martin made on April 22, 2011.

Under Minn. Stat. § 332.70(3), which is the basis for Count VII, First Advantage had to "investigate the disputed record" after Martin faxed a dispute form. Specifically, First Advantage was required to "review and consider all relevant information submitted by the subject of the record with respect to the disputed record." *Id*. at § 332.70(3)(a). Then, if necessary, First Advantage had to "correct the disputed record so as to accurately reflect the content of the official record." *Id*. at § 332.70(3)(b).

The MBSSA goes on to state that "A business screening service in compliance with the applicable provisions of the Fair Credit Reporting Act … is considered to be in compliance with this section." *Id*. at § 332.70(5)(b).

Here, the "applicable provision" of the FCRA is 15 U.S.C. § 1681i(a), which is almost identical to the MBSSA and is the basis for Count IV. First, "with respect to disputed information in the file of" Martin, First Advantage had to "review and consider all relevant information submitted by the consumer." *Id*. at § 1681i(a)(4). Then, First Advantage had to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information." *Id*. at § 1681i(a)(1)(A).

Accordingly, this Court should grant judgment in favor of First Advantage on Counts IV and VII if the evidence shows that either:  a) First Advantage complied with the MBSSA as written; or b) First Advantage complied with similar provisions in the FCRA.  First Advantage met its obligations under both statutes.

### a.     Martin Made Two Disputes: the First Was Short, the Second Was Not.

First Advantage's report about Martin stated, among other things, "NOTE: CASE DISMISSED 10/09/1998."  Martin sent First Advantage a dispute form on April 22, 2011 which stated only that "The charge ~~with~~ for impersonating officer was vacated & dismiss by the Ramsey County court …."  Webb Dec. at Ex. F (FABSC 25).  In response, a First Advantage employee reviewed the report and the dispute and declined to make any changes to the report.  Her notes accurately describe Martin's dispute and then provide her rationale for not changing the report in response to it:

> The consumer disputed case 62-TX-97-041983 claiming the case was dismissed.  We reported this case as being dismissed on 10/9/1998.  There will be no change to our reports … as the information is correct per the consumer.

Webb Dec. at Ex. J (FABSC 56, section dated 4/25/11).

On February 20, 2012, Martin disputed the First Advantage report for a second time.  On this occasion, he provided much more specific information:  he averred that he was not found guilty; that he was not sentenced to a year in jail; and that his record had been expunged.  *Id.* at Ex. H (FABSC 39).  On March 9, 2012, a First Advantage employee reviewed this dispute and accurately described it in her notes.  *Id.* at Ex. J, (FABSC 56, section dated 3/9/12).  Those notes further stated that First Advantage would

delete the entire record relating to Martin's 1997 impersonating an officer charge, because the court could not locate any such record.  Webb Dec. at Ex. J (FABSC 57).

### b. Martin Admitted that First Advantage Complied with the Law.

The FCRA required First Advantage to conduct a "reasonable investigation."  15 U.S.C. at § 1681i(a)(1)(A).  If First Advantage did so, then it complied with both the FCRA and also the MBSSA.  See Minn. Stat. § 332.70(5)(b).  Because Martin testified that First Advantage did not act unreasonably, he cannot claim that it violated either the FCRA or the MBSSA.

Martin was asked at his deposition to review three documents related to his April 2011 dispute – the report, the dispute form, and the employee notes – and to state whether, in his opinion, First Advantage acted unreasonably.  His testimony indicates that, knowing full well that his statements were against interest, he agreed that First Advantage did not act unreasonably:

> Q.    All right.  Now I want you to take a look at Exhibit 27 [Spak Dec. at C-27].
>
> A.    Okay.
>
>           *      *      *      *      *      *      *
>
> Q.    If you look at this fourth box on page [FABSC] 56 of Exhibit 27, it gives the rationale that the First Advantage employee provided for keeping your report the same following your April 22, 2011, dispute. And it says that you disputed the case claiming it was dismissed. We reported this case as being dismissed.  There will be no change to our reports as the information is correct per the consumer.
>
> Do you feel that this decision on First Advantage's part was unreasonable?

A.      I don't even know how to answer that question, to be honest with you, sir, but -- I don't know what First Advantage's intentions or feelings or. . .

Q.      I'm not asking that.  I'm just asking:  What was the -- was it unreasonable for First Advantage to say since you said the case had been dismissed and our report said the case was dismissed, we'll just keep the report the same?  Was that an unreasonable decision?

A.      I can't answer that, to be honest.

Q.      Why can't you answer it?

A.      Because that's what you wrote or that's what is stated in this memo to file on here based off the information that I provided in terms of my dispute.  Based on the question that that was being asked in that dispute, I didn't think I had to go straight to detail.  Just gave pretty simple explanation on why I think it needed to be reinvestigated.

        Shit.  I don't know.  I mean that kind of puts me - - if I say yes, it kind of makes me look like I'm kind of making myself - - I'm testifying against myself, which doesn't make sense.

        Can you give me a minute to use the bathroom?

Q.      Sure.

A.      Thanks.

                    *       *       *       *       *       *       *

A.      I would say that they were going based off of my answer to the question, yes.  Again, can you repeat the question again?

Q.      Can you read it back again?

Q.      *Was it unreasonable for First Advantage to say since you said the case had been dismissed and our report said the case was dismissed, we'll just keep the report the same?  Was that an unreasonable decision?*

A.      No.

Q.     Was the answer that you just gave to the question no?

A.     The question, if I understand the question correctly, I would say no.

Q.     Okay.   So in other words, First Advantage's decision was not unreasonable?

A.     From what I wrote down, I would say no, it was not unreasonable.

Spak Dec. Ex. B (Martin Dep.) at 221-25 (extraneous discussion and objections omitted; question as read back in italics).

This testimony alone establishes that First Advantage's reinvestigation was "reasonable," that it did not violate the FCRA at § 1681i, and that First Advantage should be granted judgment on Martin's Claim IV and Claim VII.

**c.     First Advantage Complied with the Text of the FCRA and MBSSA.**

The text of both the MBSSA and the FCRA indicates that what First Advantage's employees did in response to Martin's two disputes – they reviewed only the specific issues that he raised in his dispute form – was exactly what the law required them to do. Neither the MBSSA nor the FCRA states that when a consumer disputes a specific item in a report, the consumer reporting agency must review not only the specific item being disputed, but every other aspect of the report as well.

Under the MBSSA, First Advantage had to "review and consider *all relevant information submitted* by the subject of the record with respect to the *disputed record*." Minn. Stat. § 332.70(3)(a).  Likewise, the FCRA required First Advantage to "review and consider *all relevant information submitted* by the consumer … with respect to *disputed information* in the file."  15 U.S.C. § 1681i(a)(4).

- 27 -

In its response to both of Martin's disputes, First Advantage focused on the "relevant information" that Martin gave them about the "disputed information" in his "file" or "record."  First Advantage employees accurately wrote down what Martin was disputing and then took steps to determine if the disputed portion of the First Advantage report needed to be changed.  That is exactly what both statutes required them to do.

The statutes never state or even suggest that the First Advantage employee who reviewed Martin's April 2011 dispute should have looked beyond the "relevant information" that he provided and gone on to review each and every line item in the First Advantage report.  Or as Martin himself put it, "From what I wrote down, I would say no, it [*i.e.,* First Advantage's focus on "relevant information"] was not unreasonable."  Spak Dec. at Ex. B (Martin Dep.) at 225.  For this reason, the Court should find that First Advantage complied with both the MBSSA and FCRA and grant judgment in its favor on Count IV and Count VII.

### d.  Case Law Shows that First Advantage Complied with the FCRA.

Relevant case law – including the cases that this Court cited in its prior Order denying First Advantage's motion to dismiss Martin's FCRA claim – indicates that First Advantage did not violate the FCRA (which means that it did not violate the MBSSA either).  The cases state that First Advantage complied with the law because it reinvestigated the "relevant information" that Martin disputed:  the law did not require First Advantage to reinvestigate other information that he did not specifically dispute.

To place the case law in context, the FCRA strikes a balance between protecting consumer information and allowing businesses like Wells Fargo to use such information.

*Compare* 15 U.S.C. § 1681(a)(4) (stating that "consumer reporting agencies [have] grave responsibilities … for the consumer's right to privacy") *with* § 1681(a)(3) ("[c]onsumer reporting agencies have assumed a vital role in assembling and evaluating … information on consumers"); *see also* § 1681(b) (stating that "consumer reporting agencies [must] adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer").

The case law reflects this balance.  This Court's prior Order cited the well-supported proposition that First Advantage, like all consumer reporting agencies, has a "grave responsibility" under FCRA "to ensure the accuracy of [the] information contained in its report."  ECF No. 31 at p. 19 (citing *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3rd Cir. 1997).  But the District of Minnesota has elsewhere cited the equally well-supported proposition that "the FCRA is not a strict liability statute." *Schmitt*, 2005 U.S. Dist. LEXIS 18029, at *9.

Another case, which this Court cited in its prior opinion, suggests that the very phrase "reasonable reinvestigation" reflects an attempt by Congress to strike this balance:

> [T]he term "investigation" on its own force implies a fairly searching inquiry. It is thus likely that, if anything, the "reasonable" qualifier with regard to reinvestigations by CRAs signals a limitation on the CRAs' duty, not an expansion of it beyond what "investigation" itself would signal.

*Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1156 (9th Cir. 2009) (cited at ECF No. 31 at pp. 18-19).

A series of appellate decisions have addressed how to strike this balance – how to require consumer reporting agencies to honor their "grave responsibility" to consumers without subjecting them to strict liability – in the context of litigation over the agencies' investigations of a consumer's dispute.[4]   These decisions hold that an investigation is reasonable when it focuses on the specific items that are listed in a dispute form:

• In *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004), the court found that MBNA's investigation was unreasonable because "MBNA was notified of the specific nature of Johnson's dispute" but did not conduct a specific investigation.[5]

• In *Westra v. Credit Control of Pinellas*, 409 F.3d 825 (7th Cir. 2005), the defendant, like First Advantage, responded to two disputes:  the first dispute said an account did not belong to the plaintiff, and the defendant kept its information unchanged;

---

[4]This Court's prior Order cited many of these cases.  It also cited *Cushman*, but only for the general (and undisputed) proposition that First Advantage owed a "grave responsibility" to Martin.  *Cushman* addressed a common practice by the three national credit bureaus:  when consumers dispute credit accounts, the bureaus send automated forms called ACDVs to the creditors, and the bureaus change the report if and only if the creditors say that it should be changed.  *Cushman* called this process "merely parroting information received from other sources," and it did not find the process to be reasonable, at least not when the creditor's own data may be corrupt (as it was in the case of identity theft that the *Cushman* court had before it).  115 F.3d at 225.  *Cushman* is distinguishable from the dispute before this Court:  First Advantage is not a national credit bureau; it does not use ACDVs but instead contacts courts directly; and it is not arguing (as the defendant in *Cushman* did) that a cursory reinvestigation is a reasonable one.

[5] *Johnson*, along with *Westra*, *Anderson*, and *Chiang* below, discusses only furnishers of credit data, whose duty to investigate disputes arises under § 1681s-2, as opposed to consumer reporting agencies, whose duty arises under § 1681i.  This is not a meaningful distinction for present purposes:  the *Johnson* court, along with every other court to review a claim under § 1681s-2, looked to § 1681i to delineate the § 1681s-2 duty. *Johnson*, 357 F.3d at 431 (citing § 1681i cases from the Eleventh and Fifth circuits to construe the § 1681s-2 duty); *Chiang*, 595 F.3d 26, 37 (citing *Gorman*, *Johnson*, and *Westra*, and concluding that § 1681s-2 "imposes essentially the same obligation" on creditors as § 1681i does on reporting agencies).

a subsequent dispute explicitly mentioned fraud, and the defendant deleted that information.   The court found that "Credit Control's investigation in this case was reasonable given the scant information it received regarding the nature of Westra's [first] dispute" and affirmed summary judgment to the defendant.  *Id*. at 827.

•       In *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1155 (9th Cir. 2009), the court affirmed summary judgment for defendant CRAs and furnishers, finding that they conducted reasonable investigations given the vague dispute forms they received.  The Ninth Circuit stated that "*Johnson* … recognized that the reasonableness of an investigation depends on the facts of the particular case, most importantly the CRAs' description of the dispute."  *Gorman*, 584 F.3d 1147, 1160.

•       In *Chiang v. Verizon New England, Inc*., 595 F.3d 26, 40 (1st Cir. 2010), the court affirmed summary judgment for the defendant because its investigation was reasonable in light of the "cursory notices" it received regarding the plaintiff's disputes.

•       In *Anderson v. EMC Mortg. Corp*., 631 F.3d 905 (8th Cir. 2011), the Eighth Circuit, whose decisions are binding on this Court, also affirmed the decision to grant a defense motion for summary judgment.  It found that a defendant acted reasonably when it investigated the precise issue raised in a dispute (whether its account was delinquent) and not a separate issue that had not been raised until litigation (the month in which the delinquency began).  The court quoted *Gorman* and cited *Westra* for the proposition that the defendant "need investigate only 'what it learned about the nature of the dispute from the description in the CRA's notice of dispute.'"  *Id*. at 908.

In summary, decisions by the First, Fourth, Seventh, Eighth, and Ninth Circuits all state that a reasonable investigation is one that addresses the precise dispute presented. The statutory text, with its focus on "relevant information," is consistent with this approach. Martin himself agreed with it in his deposition testimony. Spak Dec. at Ex. B (Martin Dep.) at 225. ("From what I wrote down, no, [the reinvestigation] was not unreasonable").

The precise issue that Martin raised on April 22, 2011 was whether First Advantage's report accurately stated that his 1997 criminal record had been dismissed. He did not raise any other issues on that date, though he did raise them in a later and more detailed dispute, which resolved them.

First Advantage's reinvestigation of the April 22, 2011 dispute addressed the precise issue that it raised. In light of Martin's testimony, the statutory text, and relevant case law, this Court should find that First Advantage conducted a reasonable reinvestigation which satisfies the FCRA and MBSSA. Accordingly, this Court should grant judgment in First Advantage's favor on Martin's § 1681i claim (Count IV) and his related MBSSA claim (Count VII).

## CONCLUSION

Martin is a sympathetic figure, and the federal regulations that led Wells Fargo to fire him and thousands of other employees are arguably bad laws. But the question at the summary judgment stage is not whether Martin is entitled to sympathy, or whether federal regulations are bad; it is whether First Advantage complied with its duties under the law. The undisputed facts show that it did.

- 32 -

If First Advantage's report was exempt from the FCRA under 15 U.S.C. § 1681a(y) (it was); if the information in that report was current under the MBSSA (it was); if First Advantage provided the report on a proper occasion, for a proper purpose, and on probable cause (it did), if Martin's claims for negligence, negligence per se, and intentional interference all duplicate his claim for defamation (they do), and if First Advantage reinvestigated the precise dispute which Martin made (it did), then judgment should be granted to First Advantage on all counts of Martin's Amended Complaint.

Respectfully submitted,

/s/ Jason A. Spak
Jason A. Spak (admitted *pro hac vice*)
PICADIO SNEATH MILLER & NORTON, P.C.
Four Gateway Center
444 Liberty Avenue, Suite 1105
Pittsburgh, PA 15222
*Counsel for First Advantage*


/s/ Debra L. Weiss
Debra L. Weiss (#288810)
MEAGHER & GEER
33 South Sixth Street, Suite 4400
Minneapolis, MN  55402
*Counsel for First Advantage*